Ronald W. Dunbar, Jr. (Massachusetts BBO No. 567023)
*Pro Hac Vice Pending*
Dunbar Law PC
10 Post Office Squar Boston, MA 02108
Tel. (617) 244-3550
dunbar@dunbarlawpc.com

Carl J. Marquardt (WSBA #23257)
Law Office of Carl J. Marquardt PLLC
1126 34th Avenue, Suite 311
Seattle, WA 98122
Tel: 206-388-4498
carl@cjmpllc.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| MICHELLE OLIVER,<br><br>       Plaintiff,<br><br>              v.<br><br>Olympic Community Action Programs, a Washington nonprofit corporation; Cherish Cronmiller, individually and as the Executive Director of Olympic Community Action Programs; Rodney Miller, individually and as the Director of Olympic Community Action Programs; Jefferson County, Quilcene Community Center; Richard Fitzgerald, individually and as Manager of Quilcene Community Center; Greg Brotherton, individually and as Jefferson County Commissioner,<br><br>       Defendants. | Case No.: **3:24-CV-05610**<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT - 1

**PARTIES**

1. The Plaintiff, Michelle Oliver ("Oliver"), resides in Washington State.

2. The Defendant, Olympic Community Action Programs ("OlyCAP"), is a Washington nonprofit corporation doing business at 228 W 1st Street, Port Angeles, Washington.

3. The Defendant, Jefferson County, is a Washington municipality. Defendant owns and operates the Quilcene Community Center ("QCC") at 294952 US-101, Quilcene, Washington.

4. The Defendant, Richard Fitzgerald ("Fitzgerald"), is an individual employed by QCC at 294952 US- 101, Quilcene, Washington.

5. The Defendant, Greg Brotherton ("Brotherton"), is a County Commissioner of Jefferson County, Washington, at 1820 Jefferson Street, Port Townsend, Washington.

6. The Defendant, Cherish Cronmiller ("Cronmiller"), is an individual employed by OlyCAP at 228 W 1st Street, Port Angeles, Washington.

7. The Defendant, Rodney Miller ("Miller"), is an individual employed by OlyCAP at 228 W 1st Street, Port Angeles, Washington.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction over the matters asserted herein under 28 U.S.C. §§ 13 because this action involves a claim arising under the "Constitution, laws, or treaties of the United States" and also Title III of the American with Disabilities Act of 1990, 42 U.S.C. § 12182. This Court has subject matter jurisdiction over the remaining claims asserted herein under 28 U.S.C. § 1367 because they form part of the same case or controversy.

9. This Court has personal jurisdiction over the defendants because they reside within the Western District of Washington.

10. Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

# FACTS

11. On November 21, 2022, Oliver and her husband attended a meeting regarding management of the Quilcene Community Center ("QCC"). Through a contract with Jefferson County, the QCC is managed by the Olympic Community Action Programs ("OlyCAP"). OlyCAP is a 501(3)(c) non-profit organization. OlyCAP manages two other community centers in the area: Brinnon Community Center ("Brinnon") and Tri- Area Community Center ("Tri-Area").

12. As of 2022, the contract between Jefferson County and OlyCAP was up for a three-year renewal. Many people in the community were dissatisfied with how the QCC was being run.

13. At that meeting, Oliver and her husband asked several pointed questions, and had some heated exchanges with both Cherish Cronmiller, the Executive Director of OlyCAP, and Jefferson County Commissioner Greg Brotherton. Most notably, Oliver repeatedly stated Quilcene needed a full review of OlyCAP's management of the QCC. Brotherton insisted this was unnecessary and that everyone should focus on a "positive path forward".

14. The OlyCAP contract requires OlyCAP to appoint an Advisory Board to assist in development of community-based programs for the residents of Quilcene. Because OlyCAP had failed to appoint an advisory board for over seven years, six attendees agreed to start an interim advisory board for the QCC. Oliver and her husband met and discussed the concerns they had both with continuing the OlyCAP contract for an additional three years and with the financial information regarding profits taken from the QCC.

15. A preliminary review of the annual financial statements identified that OlyCAP had made "profits" from operating the three Centers (QCC, Brinnon and Tri-Area) and kept the profits. The preliminary review also revealed that OlyCAP had paid for health insurance for a part time employee for 16 years when in fact health care benefits are only available to full time employees. Oliver's husband exchanged several emails with Cherish Cronmiller and received further data verifying these findings. The total loss to the QCC, Brinnon and Tri-Area is

COMPLAINT - 3

approximately $200,000.

16. On December 19, 2021, Oliver and her husband attended, via Zoom, an open Commissioners meeting for Jefferson County. These are usually weekly Monday morning meetings where the public is offered an opportunity to make statements, and the three Commissioners are able to respond. Oliver and her husband each made a two–minute statement regarding the financial and management operations of the QCC. Oliver and her husband both outlined the financial issues and their concerns that funds were inappropriately taken from QCC. Commissioner Brotherton strongly disagreed with their comments, but said that he would look into the situation.

17. Eventually Commissioner Brotherton had a private meeting with Oliver's husband in which he told Oliver's husband to "forget about the past and focus on the future." Commissioner Brotherton attempted to "horse trade" by promising the completion of a commercial kitchen for the QCC and installation of community showers if Oliver and her husband stopped pressing on old money issues. Oliver's husband indicated that a complete audit of past financials was still needed.

18. Oliver's husband continued to press Cronmiller for information regarding several financial management issues, and past program management for the QCC. Cronmiller initially responded to a list of questions Oliver's husband prepared. Cronmiller then sent an email saying that she would not allow people on the Board who were asking too many financial questions or were interested in Community self-management of the QCC.

19. On January 6, 2022, Cronmiller attended the QCC Advisory Board meeting and reiterated that the Advisory Board was not to be used for discussion of OlyCAP's financial performance or program performance, and that anyone interested in talking about these matters or community, self-management of the QCC should not be on the advisory board.
During this meeting, she acknowledged that there were profits taken from the QCC. She pledged to return one-year's profits, $8,000, to the Advisory Board for program scheduling. This never occurred.

COMPLAINT - 4

20. The Advisory Board met and decided to look into activity classes for children. This was the # 1 requested program in a community survey. A number of the people had asked specifically about ballet classes, so Oliver contacted a ballet school in Port Townsend. The school agreed to run a ballet program. Oliver sent an email to the QCC Manager, Fitzgerald, and asked him if a room could be reserved for a ballet program. Fitzgerald and Oliver went back-and-forth, and he insisted that Oliver had no right to set up or even speak to a ballet instructor.

21. On March 21, 2023, around 6 pm, Oliver and her husband went to the QCC for a meeting regarding a desired skate park in Quilcene. When Oliver entered the room, Oliver saw a woman named Carol, who was a partner of Craig Uchida, sitting by herself. Oliver heard shouting in the back room and asked what was going on. Carol said Mr. Uchida had been talking to Fitzgerald and his wife, and that the conversation had become very heated. Carol suggested the parties go back and see if they could help Mr. Uchida.

22. Oliver went to the back room. When she walked in, she saw Fitzgerald speaking angrily to Mr. Uchida, who was seated across the table from him. Fitzgerald turned to Oliver and began to yell that Oliver had no right to speak to ballet instructors. Oliver told him that she did have the right because the Advisory Board had given her the task and that they had a great instructor, who was willing to come all the way to Quilcene for a very low fee of $50 a class. Fitzgerald continued to get angrier and began to say things such as the following:

> You don't have any rights around here. I am the Community Center Manager, and I am the only authority. You have no power and there is nothing you can do. Nothing will get done in here unless I want it done. You don't mean anything. I am the one that gets paid. You do not count for anything in here.

23. Fitzgerald's wife also jumped in and began accusing Oliver of talking about them behind their back and making them look like they were crazy. Oliver tried to calm them down, but failed and then left the room. Before Oliver left, her husband entered and attempted to calm things down and re-direct Fitzgerald to a discussion about "new policies and procedures" that Fitzgerald had said had been put in place. This also failed and Fitzgerald turned his

COMPLAINT - 5

aggression toward Oliver's husband. This led to a request for a protective order (as discussed in paragraph 31 below).

24. Oliver was very shaken after this happened and was concerned about running into Fitzgerald again. Oliver and her husband volunteered weekly on Wednesdays to set up, operate and break down the Quilcene Foodbank that operates at the QCC. Also, Oliver and her husband conducted weekend food rescue activities which required them to pick up and deliver food from grocery stores, like WinCo in Silverdale WA. This activity required them to be at the QCC on weekends. Further, they participated in community-based meetings.

25. Having a large man, such as Fitzgerald, yell at Oliver, berate her, tell her she has no power, and that he has full authority over her, triggered Oliver's PTSD.

26. Oliver was concerned about being able to continue as a volunteer at the Foodbank. Oliver sent a complaint to OlyCAP and did not get a response. The food bank manager at that time, Leslie Tippins, told Oliver that she spoke to Fitzgerald on March 27, 2023, regarding the incident on March 21, 2023. She reported that Fitzgerald had said:

> He had been a bouncer.
> He could slam dunk John like a basketball. When he was a bouncer he would put roofies in people's drinks to get even with people that pissed him off.

27. Ms. Tippins also indicated that Cronmiller had assured her that Fitzgerald would not be at the Foodbank when it was operating at the QCC. Fitzgerald is a part-time employee with a flexible schedule, so his not being at the Center during food bank operations would not impair his job or earnings.

28. While Oliver was volunteering on March 29, 2023, Oliver saw that Fitzgerald was actually at the Foodbank. Oliver became very agitated and asked Leslie what was going on. Leslie told Oliver she didn't know because Cronmiller had told her that Fitzgerald would not be there. Oliver left and sent an email to Imelda Walters (who was in charge of OlyCAP's Human Resources) and asked her what was going on. Oliver also called her to ask her what OlyCAP was doing.

COMPLAINT - 6

29. Oliver told her that Fitzgerald was not supposed to be there, but that Oliver had seen him there, and that Oliver was scared of running into him. Oliver let her know that she and her husband have a lot of volunteer duties and that she needed help. Oliver received a phone call on her husband's phone from Ms. Walters. When Oliver answered it, she said "oh, I didn't mean to dial you. I'm not supposed to speak to you. Commissioner Brotherton is going to deal with this."

30. Oliver told Ms. Walters that Commissioner Brotherton was the County Commissioner and that Oliver needed to talk to someone at OlyCAP because this was an OlyCAP issue.

31. Based upon a call with the County Sheriff, Oliver's husband filed a petition for a protective order. The protective order was denied.

32. On approximately April 2, 2023, Oliver's husband, Mr. Uchida and Oliver had a meeting with Commissioner Brotherton to discuss his promises to support the commercial kitchen and showers/bathroom at the QCC. Commissioner Brotherton informed Oliver and her husband that it would be inconvenient to remove Fitzgerald from the Center, that Fitzgerald "needs a lot of training and has bad people skills', that he is "going to need guard rails and that he would establish them". He also said that Oliver and her husband and Mr. Uchida created a toxic environment and called them "the Spanish Inquisition". Brotherton told them that if they did not back off the financial investigation he would pull his support from all community endeavors, including the commercial kitchen and shower project, and kick them off the advisory board.

33. Subsequent to the hearing Cronmiller sent an email to Oliver, her husband and Mr. Uchida, informing them that they were RSVP (Retired Senior Volunteer Program) volunteers under the OlyCAP program. Because Oliver's husband had filed a protective order request and because Oliver had made a complaint to OlyCAP about Fitzgerald, they would be kicked out of the Foodbank volunteer program. RSVP Volunteers must be over 55 years of age and Oliver was only 50 at the time, and therefore could not volunteer under their program. Cronmiller had attended the hearing for the protective order. Cronmiller testified that Fitzgerald

COMPLAINT - 7

was an excellent employee, and that Oliver was motivated by racism.

34.     Oliver and her husband stopped their volunteer activities for the next year.  Mr. Uchida was allowed to continue.

35.     In March 2024, Mr. Uchida, the new JCFBA (Jefferson County Food Bank Association) President, asked Oliver and her husband to return to their volunteer positions at the Foodbank.

36.     While Oliver and her husband were working, someone took pictures of them and sent them to Fitzgerald.  Fitzgerald came to the QCC and was irate that Oliver and her husband were there.  He interacted with Patricia Hennessy, Executive Director of the JCFBA, Mr. Uchida, Kris Mokma, Acting Quilcene Food Bank manager, and several other volunteers and demanded that Oliver and her husband be identified as trespassers and forced to leave the QCC.  Fitzgerald claimed that they were prohibited from being there because Cronmiller had revoked their volunteer status over a year previously for racism against him.  Fitzgerald called the Sheriff and demanded to have Oliver and her husband removed.  Two Deputy Sheriffs arrived.  On bodycam footage,  Fitzgerald can be seen trying to explain his conduct towards Quilcene Foodbank Volunteers, and the Executive Director of the JCFBA.  Fitzgerald was abusive towards Oliver and her husband and made slanderous statements about both of them.  Though Oliver and her husband were aware that Fitzgerald was making a crisis out of their return, they were not asked to leave, nor interviewed by the deputies.  Fitgerald's repeated reason for Oliver and her husband's banishment was their purported racism.  Oliver is a bi-racial person of color and no evidence was provided that supports the claim that Oliver and her husband are racist.

37.     Oliver learned that the Executive Director of the JCFBA, Ms. Hennessy, was also the recipient of physical intimidation by Fitzgerald.  Patricia is seen on the body cam footage reporting "on the record" Richard Fitzgerald's physical intimidation.  Oliver filed another complaint with OlyCAP.

38.     Oliver contacted OlyCAP and asked them to please review her complaint as what she experienced had now been experienced by at least one other person.  OlyCAP did not respond

COMPLAINT - 8

to Oliver's emails. Oliver called Rodney Miller (Director of Human Resources) and had a conversation with him about this issue. He said he understood Oliver's concerns and would look into the situation and get back to her. When Oliver did not hear from him for two weeks, she sent him an email asking him for an update. Miller told Oliver that if she continued to push the issue with Fitzgerald that she would no longer be permitted to volunteer with the Foodbank. Oliver responded that this was again retaliatory and that she would appreciate it if they could work through this issue together. Oliver also let him know that she had some protections under the American with Disabilities Act, and she would like to have a meeting.

39. Miller then sent the email indicating that if Oliver continued to push the historical issues as to finances, he would remove her from her volunteer status at the food bank. It was the second time in two years that OlyCAP threatened Oliver with removal for seeking their help in dealing with an OlyCAP bullying issue. Oliver and her husband also understand that Commissioner Brotherton's family has close ties with Fitzgerald. They were told that Fitzgerald referred to Commissioner Brotherton's father as "dad" in a meeting.

40. Miller asked Oliver to specify what she wanted before he would schedule a meeting. Oliver was surprised that Miller was asking her what she is seeking, as it was obvious she wanted OlyCAP to look into the ongoing bullying issues.

41. When Oliver's husband and Oliver decided to volunteer at the Quilcene Foodbank, it was their first time going out into the Community. Oliver has been under intense treatment for PTSD and she had recovered enough that she was able to work outside her home for the first time in many years. Her migraines receded and she had gained a little weight and was sleeping better. The interactions she had with people while volunteering at the Foodbank were very beneficial to her PTSD recovery. Oliver was gaining confidence and stability, and she was finding a lot of joy in the Foodbank environment. Oliver really enjoyed helping people. Oliver wanted to continue this volunteer activity and believed that OlyCAP would offer her some protection as they investigated the situation.

42. Unfortunately, Cronmiller used this as an opportunity to get rid of Oliver. This

COMPLAINT - 9

further triggered her PTSD and she began having migraines/sleep issues and difficulty with eating. Oliver had to increase medications and health treatments. Oliver and her husband had raise a number of troubling issues with OlyCAP. Barring them from further volunteer work and participation in the QCC Advisory Board was a way of burying these issues.

## CLAIMS

### Count I

### (Intentional Infliction of Emotional Distress v. All Defendants)

43. Oliver repeats and realleges the above.

44. The Defendants engaged in extreme and outrageous conduct that amounted to intentional or reckless infliction of emotional distress, and actually resulted in Oliver suffering severe emotional distress.

### Count II

### (Negligent Infliction of Emotional Distress v. All Defendants)

45. Oliver repeats and realleges the above.

46. The emotional distress is within the scope of foreseeable harm of the negligent conduct of the Defendant towards Oliver.

47. Oliver reasonably reacted given the circumstance.

48. Oliver has objective symptomatology that confirms the distress.

### Count III

### (Slander v. All Defendants)

49. Oliver repeats and realleges the above.

50. The Defendants made false and unprivileged communications about Oliver.

51. The Defendants were at fault.

52. Oliver suffered damages.

### Count IV

### (Violation of the American with Disabilities Act v. Olympic Community Action Programs and Quilcene Community Center)

COMPLAINT - 10

53. Oliver repeats and realleges the above.

54. Title III of the American with Disabilities Act of 1990, 42 U.S.C. § 12182(a) provides that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."

55. Title III also prohibits an entity from "[u]tilizing standards or criteria or methods of administration that have the effect of discriminating on the basis of disability." 42 U.S.C. § 2181(b)(2)(D)(I).

56. Under Title III of the ADA, 42 U.S.C. § 12182(b)(1)(A)(I), it is unlawful discrimination to deny individuals with disabilities or a class of individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.

57. Under Title III of the ADA, 42 U.S.C. § 12182(b)(1)(A)(II), it is unlawful discrimination to deny individuals with disabilities or a class of individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded to other individuals.

58. Specifically, under Title III of the ADA, 42 U.S.C. § 12182(b)(2)(A)(II), unlawful discrimination includes, among other things, "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations."

59. In addition, under Title III of the ADA, 42 U.S.C. § 12182(b)(2)(A)(III), unlawful discrimination also includes, among other things, "a failure to take such steps as may be necessary to ensure that no individual with disability is excluded, denied services, segregated or

otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden."

60. The acts alleged herein constitute violations of Title III of the ADA, 42 U.S.C. § 12101 et seq., and the regulations promulgated thereunder.

61. Unless the Court enjoins Defendant from continuing to engage in these unlawful practices, Plaintiff will continue to suffer irreparable harm.

62. The actions of Defendant were and are in violation of the ADA, and therefore Plaintiff invokes her statutory right to injunctive relief to remedy the discrimination.

63. Plaintiff is also entitled to reasonable attorneys' fees and costs.

64. Pursuant to 42 U.S.C. § 12188 and the remedies, procedures, and rights set forth and incorporated therein, Plaintiff prays for judgment.

## Count V
### (Discrimination Based Upon Origin, Race and Sex v. Olympic Community Action Programs and Quilcene Community Center)

65. The Plaintiff is a member of a protected class.

66. Defendants' establishment is a place of public accommodation.

67. Defendants discriminated against the Plaintiff by treating her differently from persons outside the class, in violation of Wash. Rev. Code 49.60.030

68. Plaintiff's protected status was a substantial factor causing discrimination.

## Count VI
### (Breach of Contract v. Olympic Community Action Programs)

69. Oliver repeats and realleges the above.

70. OlyPAC had a contract to run the QCC.

71. OlyPAC breached the contract.

72. Oliver was a third party beneficiary of the contract.

COMPLAINT - 12

73. Oliver was damaged.

## Count VII

### (Assault v. Richard Fitzgerald)

74. Oliver repeats and realleges the above.

75. Plaintiff's apprehension of imminent physical violence was caused by the Defendant's action or threat.

**WHEREFORE**, Plaintiff respectfully demands judgment as follows:

A. A declaratory judgment that actions, conduct, and practices of Defendants complained of herein violate the laws of the United States and the State of Washington;

B. An injunction and order permanently restraining Defendants from engaging in such unlawful conduct.

C. An award of damages in the amount to be determined at trial; plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic harm;

D. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory harm, including but not limited to, compensation for mental anguish, humiliation, embarrassment, stress, and anxiety, emotional pain and suffer, and emotional distress; and

E. An award of damages for any and all other monetary/non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

F. The costs and disbursements of this action; and

G. Such other and further relief as this Court may deem just, proper, and equitable.

COMPLAINT - 13

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.**

Dated this 30th day of July, 2023.

LAW OFFICE OF CARL J. MARQUARDT, PLLC

By: /s/ Carl J. Marquardt .
Carl J. Marquardt (WSBA #23257)
1126 34th Avenue, Suite 311
Seattle, WA 98122
Tel. 206-388-4498
carl@cjmpllc.com

Ronald W. Dunbar, Jr. (Massachusetts BBO No. 567023)
*Pro Hac Vice Pending*
Dunbar Law PC
10 Post Office Squar Boston, MA 02108
Tel. (617) 244-3550
dunbar@dunbarlawpc.com

*Attorneys for Plaintiff*

COMPLAINT - 14