UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MICHELLE OLIVER,<br><br>     Plaintiff,<br>  v.<br><br>OLYMPIC COMMUNITY ACTION<br>PROGRAMS et al.,<br><br>     Defendants. | CASE NO. 3:24-cv-05610-DGE<br><br>ORDER ON MOTIONS FOR<br>SUMMARY JUDGMENT (DKT.<br>NOS. 39, 42) |

Before the Court are Defendants' motions for summary judgment.  (Dkt. Nos. 39, 42.)

The Court has considered the pleadings filed in support of and in opposition to the motions and

the remainder of the record.   For the reasons set forth below, Defendants' motions are

GRANTED.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The dispute in this case began as a disagreement over the management of the Quilcene

Community Center ("QCC" or "The Center").  Olympic Community Actions Programs

("OlyCAP"), a 501(c)(3) nonprofit corporation, operates QCC and two other community centers

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 1

under a three-year contract with Jefferson County.  (Dkt. No. 40 at 100–106.)  OlyCAP "[p]rovide[s] daily operation" of the community centers, which includes scheduling of events, program planning and activities, building security, and scheduling use of the centers by community groups and organizations.  (*Id.* at 100.)  OlyCAP is also responsible for "[a]ppoint[ing] local advisory boards, one for each community center."  (*Id.* at 101.)  While the contract assigns responsibility for appointing these advisory boards to OlyCAP, it does not define the term, describe the authority of board members, or explain how board members will be selected.  To fulfill its obligations under the contract, OlyCAP employs a Center Manager at QCC who is responsible for day-to-day management of the facility.  (Dkt. No. 39 at 3.)  Some time before the events giving rise to this lawsuit, QCC Center Manager Bob Rosen retired.  (*Id.* at 4.)  In the absence of a Center Manager, QCC went without an advisory board for some time.[1] (*Id.*)  On November 17, 2022,  OlyCAP hired Richard Fitzgerald to serve as Center Manager for QCC.  (Dkt. Nos. 39 at 4; 41 at 2.)

### A.  Formation of "Interim Advisory Board"

On November 21, 2022, Plaintiff Michelle Oliver, her husband John DiMaggio and several other individuals gathered at QCC to discuss their concerns regarding OlyCAP's management of the community center.  (Dkt. No. 40 at 113–115.)  At that meeting, Plaintiff claims she and DiMaggio asked "several pointed questions" which led to "heated exchanges" with OlyCAP Executive Director Cherish Cronmiller and Jefferson County Commissioner Greg Brotherton.  (Dkt. No. 1 at 3.)  After the meeting, six attendees decided, on their own initiative, to form an "interim advisory board" for QCC.  (*Id.*)  OlyCAP did not ask these individuals to

---

[1] Plaintiff alleges OlyCAP failed to appoint an advisory board for QCC for over seven years. (Dkt. No. 1 at 3.)

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 2

form an advisory board and had no input into its formation. (Dkt. No. 39 at 4.) Despite this, the interim advisory board began holding periodic meetings concerning the governance of the community center. (Dkt. No. 46 at 160.)

On January 4, 2023, DiMaggio sent an email invitation to the next meeting of the interim advisory board, which was to be held two days later. (Dkt. No. 40 at 132–133.) On January 6, 2023, Cronmiller replied to DiMaggio's email, stating that OlyCAP "reserves the right to APPOINT who will sit on the advisory board." (*Id.* at 131.) Cronmiller stated that while members of the interim board were welcome to meet on their own time, "if there are people who simply want to decide and work on whether the Center can be volunteer run, without the involvement of OlyCAP, then THAT is not an advisory board, and is not helpful to what we are trying to accomplish with an advisory board." (*Id.*) Cronmiller stated that Fitzgerald would be present at the meeting to "see who would like to be a part of an advisory board that can look ahead to the needs of the community" but that any efforts to "dwell on past performance matters, or devise a plan for having a volunteer center" would be outside the scope of the advisory board's responsibilities. (*Id.* at 131–132.)

**B. Conflict with Fitzgerald over Ballet Classes**

In early 2023, the interim advisory board "met and decided to look into activity classes for children." (Dkt. No. 1 at 5.) Plaintiff contacted a ballet instructor, who agreed to teach ballet classes at QCC. (*Id.*) On March 21, 2023, DiMaggio emailed Fitzgerald, asking him to reserve the front room at QCC "for four Wednesday's (sic) commencing May 17 from 3:45 to 6:45 for three separate ballet classes." (Dkt. No. 40 at 110.) Fitzgerald responded the same day, stating he would need to speak will the ballet teacher and review the proposed contract before any classes could be held. (*Id.*) DiMaggio replied, stating the interim advisory board "[would] get a

contract signed, as needed." (*Id.*) Fitzgerald responded by telling DiMaggio that this was "not how things work" at QCC and that any arrangement with a ballet instructor "need[ed] to go through [him][.]" (*Id.* at 109.) DiMaggio suggested the interim advisory board could hold a meeting concerning the ballet classes, to which Fitzgerald would be invited, but asked Fitzgerald to reserve the room "as its (sic) the only time slot available." (*Id.*) Fitzgerald responded:

> I am not going to repeat this over and over and over again I am the manager of the community center anything that happens at the community center needs to go across my desk and be approved through me. I will not continue to have these things happen this way so I need to speak with the teacher about the times and what the program is going to be you do not set things up that way it needs to go through me this is the last time I mentioned this.

(*Id.*) DiMaggio told Fitzgerald he was "misunderstanding the situation" and re-stated his offer of a meeting. (*Id.*) DiMaggio told Fitzgerald he was willing to "speak about process" and stated Fitzgerald was "more than welcome to take over" once the interim advisory board reached "a consensus on the details." (*Id.*) However, DiMaggio stated the interim advisory board "want[ed] the room reserved" and again instructed Fitzgerald to reserve the room. (*Id.*) Fitzgerald responded by explaining, again, that "anything that happens [at QCC] need[ed] to go across [his] desk." (*Id.* at 108.) Fitzgerald's email, which appears to have been the final email in this chain, was sent at 3:49 PM on March 21, 2023. (*Id.*)

According to Fitzgerald, matters came to a head when he learned that Craig Uchida, another member of the interim advisory board, arranged for a board meeting to be held at the community center that evening to discuss a proposal for a new skate park. (Dkt. No. 41 at 2.) Uchida did so without consulting Fitzgerald, which was problematic because both rooms at the community center were reserved that evening by other groups. (*Id.*) Uchida offered to contact one of the groups to see if they would agree to move their meeting time. (*Id.* at 3.) Fitzgerald

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 4

told Uchida not to do this. (*Id.*) Uchida did so anyway, saying Fitzgerald's job description was so vague that it was unclear whether he had authority over bookings, to which Fitzgerald responded "Maybe, but I know YOU don't have the authority to call a proper renter of the Center and ask them to move their time." (*Id.*)

On March 21, 2023,[2] at approximately 6 PM, Plaintiff and DiMaggio arrived at QCC for the skate park meeting. (Dkt. No. 1 at 5.) After greeting Craig Uchida's wife, they heard loud voices coming from a backroom where Uchida was speaking with Fitzgerald and his wife. (Dkt. No. 40 at 165.) Hearing the loud voices, Plaintiff and DiMaggio decided to investigate and upon entering the backroom Fitzgerald "immediately stood up and began speaking . . . in a loud and forceful voice" to Plaintiff. (*Id*.) Fitzgerald told Plaintiff she had no authority to procure a dance instructor for the QCC, that only he was authorized to coordinate services at the QCC, and that such services had to be coordinated through him. (*Id*.) Fitzgerald's wife also accused Plaintiff of misconduct. (*Id*. 165–166.) Despite Plaintiff's attempts to respond to Fitzgerald and his wife, they continued to "shout, accusing [Plaintiff] of behavior they found intolerable." (*Id*. at 166.) Because of their shouting, Plaintiff left and "returned to the front room where people were beginning to gather for the meeting." (*Id*.)

In her deposition taken on September 17, 2025, Plaintiff further describes that after she entered the room, she went and sat down next to Uchida. (*Id.* at 49.) This was on the opposite side of a table from where Fitzgerald was standing. (*Id.*) The table is depicted in the following photograph:

---

[2] Plaintiff's email dated March 24, 2023 identifies this event occurred on "on Tuesday, March 22nd." (Dkt. No. 40 at 165.)

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 5



(Dkt. No. 41 at 4.)  Fitzgerald was on the side of the table where the floral chair is depicted in the photo while Plaintiff, DiMaggio, and Uchida were seated on the other side.  (*Id*. at 3.)  The door shown leads to the kitchen and out to the main meeting room; it remained open during this interaction.  (*Id*.)

Plaintiff also described that Fitzgerald "was speaking very angrily," that he was leaning forward, and that he "was gesticulating towards" Plaintiff.  (Dkt. No. 40 at 55.)  When asked to clarify what she meant, Plaintiff stated Fitzgerald "was waving his arms towards – one of his arms was going towards me" but he was not within range to make contact with her.  (*Id*. at 55–56.)  Plaintiff also testified the reason she left the room was because the interaction with Fitzgerald "was not going to go anywhere, and [she] was getting pretty unsettled."  (*Id*. at 57.)

On March 22, 2023, Fitzgerald emailed Cronmiller and Imelda Walters, OlyCAP's director of human resources, to describe his interaction with Plaintiff and DiMaggio.  (Dkt. No. 46 at 138.)  On March 24, 2023, Plaintiff filed a complaint via email with Walters describing her encounter with Fitzgerald.  (*Id.* at 86–90.)  Plaintiff claimed this was the second time Fitzgerald had shouted at her and demanded she "accept his authority."  (*Id.* at 89.)  Plaintiff claimed she felt unsafe around Fitzgerald, who was "verbally hostile" and "us[ing] his size to physically

intimate people." (*Id.* at 90.)  On March 25, 2023, DiMaggio also emailed Walters a letter of complaint concerning the incident.  (*Id.* at 84–85.)

### C.  Encounter at Food Bank

On March 27, 2023, Plaintiff called Walters and left a voicemail to complain about Fitzgerald's presence at QCC.  (Dkt. No. 46 at 123.)  Plaintiff stated she was "very nervous and uncomfortable" around "a very large man" such as Fitzgerald based on their prior interaction and did not want to be near him.  (*Id.*)  Plaintiff told Walters that Fitzgerald was often present when she volunteered at Quilcene Food Bank, which operates at QCC.  (Dkt. Nos. 1 at 6; 46 at 123.)  Walters forwarded the voicemail to Brotherton and Cronmiller.  (Dkt. No. 46 at 129.)  Cronmiller stated that while she was disinclined to believe Plaintiff and DiMaggio's account of their encounter with Fitzgerald, she would nevertheless ask Fitzgerald "to keep his distance or not be present" on days when the Food Bank was operating.  (*Id.*)  Cronmiller stated she was concerned that "[n]o one w[ould] want to work at [QCC] with [Plaintiff and DiMaggio] trying to control everything."  (*Id.*)  Brotherton responded, agreeing with Cronmiller's comments.  (*Id.* at 132.)  The same day, Cronmiller emailed Fitzgerald, encouraging him to keep his distance from Plaintiff and DiMaggio on days when they volunteered at the Food Bank.  (*Id.* at 137.)  Cronmiller instructed Fitzgerald to avoid engaging the couple, to remain calm, and to "always try to have a witness present if you speak with anyone."  (*Id.*)

### D.  Denial of Petition for Protective Order

On March 28, 2023, DiMaggio filed a petition seeking a protection order against Fitzgerald with the Jefferson County District Court.  (Dkt. No. 40 at 169–179.)  DiMaggio cited the March 21, 2023 incident at QCC along with an earlier dispute between him and Fitzgerald concerning the installation of security cameras at the community center.  (*Id.* at 177–178.)

DiMaggio described Fitzgerald as a "bully" and told the court that Fitzgerald "uses his physical size and loud voice to intimidate and dominate people."[3] (*Id.* at 175.) DiMaggio cited statements allegedly made by Fitzgerald as evidence that Fitzgerald was "willing[ ] to commit physical violence" against him. (*Id.*) On April 11, 2023, the District Court denied DiMaggio's petition on the merits after a hearing. (*Id.* at 181–187.)

On April 12, 2023, Cronmiller responded to Plaintiff and DiMaggio's complaints regarding the March 21, 2023 incident. (*Id.* at 191, 197.) Cronmiller stated the incident was merely a "heated argument" that did not warrant disciplinary action against Fitzgerald. (*Id.*) Cronmiller expressed her surprise that DiMaggio would seek an order of protection based on this disagreement, which "would not lead a reasonable person to conclude that they needed legal protection," and accused Plaintiff and DiMaggio of creating "a public legal record" that would damage Fitzgerald's future prospects. (*Id.*) Cronmiller expressed disappointment that Plaintiff and DiMaggio had "create[ed] a hostile work environment, harass[ed] agency staff, and engag[ed] in discriminatory behavior." (*Id.*) Cronmiller informed the couple that they would no longer be permitted to volunteer at the QCC project site and would "not be a part of any advisory board based on [their] behavior and communications to-date." (*Id.*) Cronmiller stated she would not report the couple for trespassing if they did show up at the community center, but informed them that she reserved the right to remove them from the facility if they "engage[d] in any behavior that harasses, intimidates or interferes with the work duties of any OlyCAP staff." (*Id.*)

---

[3] Fitzgerald is 6'4 and weighs 285 pounds. (Dkt. No. 41 at 2.) Fitzgerald is an African-American male and testified at a hearing on the petition that he believed there was an element of racism in the efforts of Plaintiff and DiMaggio to paint him as a "big, scary, black man" given that he had "not actually done anything physically intimidating or assaultive" towards either of them. (*Id.*)

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 8

After receiving these emails, Plaintiff and DiMaggio ceased their volunteer activities for nearly a year.  (Dkt. No. 1 at 7–8.)

### E.  April 3, 2024 Incident

According to Fitzgerald, on April 3, 2024, Plaintiff, DiMaggio, and Uchida arrived at QCC unannounced.  (Dkt. No. 41 at 5.)  Fitzgerald saw them and "asked Uchida to have them leave," which Uchida refused to do.  (*Id.*)  Fitzgerald called the Jefferson County Sheriff, withdrew to his office and closed the door so he could speak to the Sheriff without the trio overhearing.  (*Id.*)  Fitzgerald spoke with OlyCAP's interim director over the phone, who opted to resolve the situation by agreeing to a safety plan with Plaintiff.  (*Id.*)  Under the terms of the plan, Plaintiff and DiMaggio would be allowed to resume volunteering at the Food Bank, but would be required to remain in the front room and leave the QCC premises by 2:00 P.M., when the Food Bank closed.  (*Id.* at 6.)  While Plaintiff and DiMaggio were volunteering, Fitzgerald would not enter the front room.  (*Id.*)

### F.  Deli Incident and Food Bank Encounters

On the first day Plaintiff and DiMaggio were allowed back at QCC under the terms of the safety plan, Fitzgerald visited a deli across the street from the community center.  (*Id.* at 5.)  As Fitzgerald approached the deli, he noticed Plaintiff and DiMaggio at a coffee shop next door.  (*Id.*)  Fitzgerald attempted to avoid the couple by using the stairs at the far end of the building to enter the deli.  (*Id.*)  After Fitzgerald placed his order and took his seat, Fitzgerald claims Plaintiff and DiMaggio entered the deli and sat down at the table next to him, even though there were six open tables.  (*Id.*)  Fitzgerald claims that Plaintiff then walked towards him, asked her husband if he wanted any water, and loudly proclaimed: "It's so good to be back!  Finally, we're allowed to do something for our community.  I'm soooo glad Cherish [Cronmiller] is gone."  (*Id.*

at 5–6.)  Fitzgerald believes Plaintiff's behavior was an attempt to "rage-bait" him into overreacting.  (*Id.* at 6.)

Fitzgerald claims Plaintiff did not abide by the terms of the safety plan.  Fitzgerald states Plaintiff did not remain in the front room and would instead wander the Center, "loom" at the door of his office, and speak with Fitzgerald's son while he was present.  (*Id.*)  Fitzgerald claims Plaintiff remained at the community center after 2:00 P.M., on one occasion staying until 4:00 P.M.  (*Id.*)

### G.  Communications with Rodney Miller

On June 16, 2024, Plaintiff emailed Rodney Miller, OlyCAP's director of human resources asking why Fitzgerald's "physical intimidation" of her and several other individuals was "not being considered a safety issue" for QCC.  (Dkt. No. 46 at 172.)  The next day, Miller responded to Plaintiff's email, stating that while he could not discuss specific personnel matters, he could confirm that any incidents involving Fitzgerald "ha[d] been addressed appropriately." (*Id.* at 171.)  Miller informed Plaintiff that OlyCAP had engaged mediations services to address her concerns and "restore peace" to the community center.  (*Id.*)  Plaintiff responded by asserting that Miller's response was "the first time [she had] received a response to the complaint [she] filed over a year ago." (*Id.* at 170–171.)  Plaintiff claimed OlyCAP never asked about her experience with Fitzgerald and referred to body camera footage[4] taken "not too long ago" that corroborated her allegations against him.  (*Id.*)

Miller replied, saying he had viewed the body camera footage in question, which revealed that Fitzgerald was being "very respectful and also very afraid." (*Id.* at 170.)  Miller

---

[4] This appears to be a reference to the police body camera footage of Fitzgerald's statements to the Jefferson County Sheriff's deputies who responded to the April 3, 2024 incident.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 10

said Plaintiff was re-litigating old issues and questioned why she was asking OlyCAP to take additional action beyond adjusting Fitzgerald's hours to avoid conflict.  (*Id.*)  Miller stated that OlyCAP stood by Fitzgerald and that if Plaintiff's difficulties with Fitzgerald persisted, OlyCAP would be "forced to revisit our agreement regarding who can be present during food bank hours."  (*Id.*)

On June 24, 2024, Plaintiff sent Miller an e-mail with the subject line "Confidential [I]nformation[.]"  (Dkt. No. 40 at 201.)  Plaintiff stated she "ha[d] some protections under the Americans with Disabilities Act[.]"  Plaintiff did not describe her disability with any specificity, only stating that when individuals such as herself were subject to "aggressive outbursts" they are "vulnerable to experiencing things with much pain and suffering."  (*Id.*)  Plaintiff claimed she was "very deeply impacted" by Fitzgerald's behavior and could document this with medical records.  (*Id.*)  Plaintiff stated she was passing along this information because of Fitzgerald's conduct, namely the fact that he "physically intimidated four other people."  (*Id.*)

**H.  August 4, 2024 Interactions**

On the evening of August 2, 2024, Fitzgerald received an email informing him that Plaintiff had initiated this lawsuit.  (Dkt. No. 41 at 6.)  Fitzgerald felt this would "empower" Plaintiff and might prompt her to "cause a scene" at a Pancake Breakfast being held that Sunday, August 4, 2024.  (*Id.*)

Plaintiff states she and DiMaggio decided to stop at the Pancake Breakfast to learn more about how the event was being coordinated.  (Dkt. No. 46 at 29.)  As soon as she walked into the QCC, Fitzgerald "appeared to be waiting for" her, walked to her, and then told her to "Get out" and that she could not be there.  (*Id*. at 29–30.)  Plaintiff described Fitzgerald as "very angry" as he stood in front of her.  (*Id*. at 30.)  Plaintiff noticed two women in the kitchen and decided to

try and enter the kitchen, at which point Fitzgerald "ran around this time he got in my face, and told me to get out." (*Id*.)  Plaintiff put her arm up, looked directly in his eyes and said, "Are you trying to physically intimidate me." (*Id*.)  Fitzgerald then "froze," at which point Plaintiff continued into the kitchen. (*Id*.)  Fitzgerald then "walked through the kitchen and said – kind of muttered, 'I'm going to go make calls.'" (*Id*.)  Fitzgerald then entered his office and closed the door. (*Id*.)  Later that day, the Sheriff issued a trespass warning against DiMaggio. (Dkt. No. 40 at 210.)  Following the incident, Plaintiff filed another complaint with OlyCAP. (Dkt. No. 1 at 8.)

On October 30, 2024, OlyCAP Executive Director Holly Morgan sent Plaintiff a letter revoking her access to QCC. (Dkt. No. 40 at 212–213.)  Morgan cited "multiple troublesome incidents" involving Plaintiff and noted that DiMaggio had appeared at the community center again despite the trespass warning. (*Id*. at 212.)  Morgan noted that Plaintiff had visited the Food Bank on August 4, 2024 "despite being told that [her] presence as a volunteer was no longer welcome" and had asked "persistent" and insinuating questions of community members that prompted complaints from two volunteers. (*Id*.)

**I.   Encounters with Greg Brotherton**

On December 19, 2022, Plaintiff and DiMaggio attended a Jefferson County Commissioner meeting via Zoom and made a public statement. (Dkt. No. 46 at 66.)  Plaintiff was "disturbed" by Commissioner Brotherton's comments, "he said that he vehemently disagreed with everything Michelle Oliver had stated.  And then he proceeded to dismiss and not address any of [Plaintiff'] concerns." (*Id*. at 67.)

On April 2, 2023, Brotherton met with Plaintiff, DiMaggio and Uchida at a local restaurant. (*Id*. at 69, 71.)  The purpose of this meeting was to talk "about the investigation into

the first assault, and, [Plaintiff] assumed, about the financial review [they] were attempting to conduct at that time." (*Id*. at 70.)[5] They discussed Fitzgerald. (*Id*.) When asked whether Brotherton said something during that meeting that may have offended Plaintiff, Plaintiff responded, "I was never offended by Commissioner Brotherton. I was very concerned and confused and – yeah." (*Id*. at 71.) When asked if Brotherton threatened Plaintiff during this meeting, Plaintiff stated, "Yes . . . . he would pull all his support if we didn't drop the financial review. And that I was toxic to Richard, and it was not convenient, even though he knew Richard had people problems, needed guardrails and needed supervision. That there would be no one to run the community center." (*Id*.)

### J.  Procedural History

On July 30, 2024, Plaintiff filed a complaint against OlyCAP, Cronmiller, Miller, Jefferson County, Quilcene Community Center, Richard Fitzgerald, and Greg Brotherton. (Dkt. No. 1.) Plaintiff asserted causes of action for: (1) Intentional Infliction of Emotional Distress; (2) Negligent Infliction of Emotion Distress; (3) Slander; (4) Violation of the Americans with Disabilities Act (against OlyCAP and Jefferson County[6]); (5) Discrimination Based Upon Origin, Race and Sex (against OlyCAP and Jefferson County[7]) under the Washington Law Against Discrimination ("WLAD"); (6) Breach of Contract (against OlyCAP); and (7) Assault (against Richard Fitzgerald). (Dkt. No. 1 at 10–13.)

---

[5] The "first assault" appears to be a reference to the interactions with Fitzgerald on March 21, 2023.

[6] Plaintiff's complaint asserts a cause of action against QCC (Dkt. No. 1 at 10), which the Court construes as a claim against Jefferson County, which owns and operates QCC.

[7] *See supra* footnote 6.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 13

On March 10, 2026, Defendants OlyCAP, Fitzgerald, Cronmiller, and Miller ("OlyCAP Defendants") filed a motion for summary judgment. (Dkt. No. 39.) The same day, Defendants Jefferson County and Brotherton ("Jefferson County Defendants") also filed a motion for summary judgment. (Dkt. No. 42.) Plaintiff responded to both motions (Dkt. Nos. 44, 45) and Defendants replied (Dkt. Nos. 48, 50).

## II.    LEGAL STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—in most civil cases, a preponderance of the evidence. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv.*

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 14

*Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv. Inc.*, 809 F.2d at 630 (relying on *Anderson*). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888–889 (1990).

## III.    DISCUSSION

### A. Timeliness

As a preliminary matter, Plaintiff argues Defendants' summary judgment motions are premature. Plaintiff asks the Court to either deny Defendants' motions or defer ruling on them pursuant to Federal Rule of Civil Procedure 56(d) because Plaintiff cannot yet present facts essential to her opposition. (Dkt. Nos. 44 at 11; 45 at 9.)

Rule 56(d) provides: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment], the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Rule 56(d) is "a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 678 (9th Cir. 2018) (quoting *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1000 (9th Cir. 2002)).

A party seeking additional discovery under Rule 56(d) must "explain what further discovery would reveal that is essential to justify its opposition to the motion for summary judgment." *Id.* (cleaned up). A party seeking to postpone summary judgment pending additional

discovery must show that: "(1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Id.* "This showing cannot, of course, predict with accuracy precisely what further discovery *will* reveal; the whole point of discovery is to learn what a party does not know or, without further information, cannot prove." *Id.* (emphasis in original). However, for purposes of a Rule 56(d) request, the evidence sought must be more than "the object of pure speculation." *Id.* (internal citation omitted).

Plaintiff filed her response to Defendants' motions for summary judgment on March 31, 2026, at which time discovery was ongoing and Plaintiff was scheduled to depose three of the named Defendants in this case in April. Plaintiff argues these individuals "are central to the claims and defenses in this case" and their testimony "is expected to bear directly on disputed issues of fact that Defendants improperly contend are undisputed." (Dkt. Nos. 44 at 11; 45 at 9.) Plaintiff argues that without the benefit of these depositions, she will not have a fully developed evidentiary record with which to oppose Defendants' motions for summary judgment. (*Id.*)

The deadline for discovery has since passed, and Plaintiff has presumably deposed these individuals. Since then, Plaintiff has not moved to supplement her responses to Defendants' motions for summary judgment based on any testimony gathered during the April depositions. Accordingly, the Court finds no basis to deny Defendants' motions for summary judgment as premature. To the extent Plaintiff asks the Court to defer ruling on Defendants' summary judgment motions until the close of discovery, Plaintiff's request is moot.

## B. Intentional Infliction of Emotional Distress

"The tort of outrage[8] requires the proof of three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress." *Kloepfel v. Bokor*, 66 P.3d 630, 632 (Wash. 2003). "The first element requires proof that the conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Robel v. Roundup Corp.*, 59 P.3d 611, 619 (Wash. 2002) (emphasis omitted) (internal quotation marks omitted) (quoting *Dicomes v. State*, 782 P.2d 1002, 1013 (Wash. 1989)). "[T]he tort of outrage 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. In this area plaintiffs must necessarily be hardened to a certain degree of rough language, unkindness and lack of consideration." *Kloepfel*, 66 P.3d at 632 (quoting *Grimsby v. Samson*, 530 P.2d 291, 295 (Wash. 1975)). An outrage claim may not proceed unless "reasonable minds could . . . differ on whether the conduct was so extreme as to result in liability." *Robel*, 59 P.3d at 619.

When considering whether conduct may reasonably be regarded as "extreme and outrageous," trial courts in Washington consider several factors, including:

> (a) the position the defendants occupied; (b) whether the plaintiff was peculiarly susceptible to emotional distress, and if the defendants knew this fact; (c) whether the defendants' conduct may have been privileged under the circumstances; (d) whether the degree of emotional distress the defendants caused was severe as opposed to merely annoying, inconvenient, or embarrassing to a degree normally occurring in a confrontation between these parties; and (e) whether the defendants were aware that there was a high probability that their conduct would cause severe emotional distress, and they consciously disregarded it.

---

[8] "'Outrage' and 'intentional infliction of emotional distress' are synonyms for the same tort." *Kloepfel v. Bokor*, 66 P.3d 630, 631 n.1 (Wash. 2003).

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 17

*Doe v. Corporation of President of Church of Jesus Christ of Latter-Day Saints*, 167 P.3d 1193, 1205 (Wash. Ct. App. 2007).

1. OlyCAP, Fitzgerald, Cronmiller, and Miller

Defendants OlyCAP, Fitzgerald, Cronmiller and Miller argue Plaintiff's outrage claim fails because no reasonable jury would find their conduct to be extreme and outrageous. (Dkt. No. 39 at 17–18.) In response, Plaintiff asserts Defendants engaged in a pattern of "escalating and hostile conduct culminating in Plaintiff's exclusion from a community space under circumstances that a reasonable jury could find retaliatory, humiliating, and intentionally harmful." (Dkt. No. 44 at 13.) Plaintiff argues the incidents involving Fitzgerald provide sufficient support for her outrage claim, and that a reasonable jury could find Fitzgerald's conduct was "extreme, intimidating, and undertaken with disregard for Plaintiff's known vulnerabilities[.]" (*Id.* at 15.) Plaintiff further argues a reasonable jury could find OlyCAP's decision not to discipline Fitzgerald exceeded the bounds of decency. (*Id.* at 13–14.) Plaintiff argues the "eggshell plaintiff" doctrine applies to her claims, given her pre-existing PTSD and Defendants' alleged notice of her condition.[9] (*Id.* at 15–16.)

a. *Plaintiff's Interactions with Fitzgerald*

Reasonable minds could not conclude that Fitgerald's interactions with Plaintiff were "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

---

[9] Defendants argue (Dkt. No. 48 at 5) that the eggshell plaintiff rule comes into play when determining damages, and is not relevant to the threshold question of whether certain conduct was extreme and outrageous. *See Lindemann v. Toyota Motor Corp.*, 2014 WL 7109378 at *7 (Wash. Ct. App. 2014) (noting the eggshell plaintiff rule comes into play "when the plaintiff proves that the defendant is liable for wrongful conduct and that conduct has caused at least some injury to the defendant" at which point the rule "imposes liability for the full extent of those injuries, not merely those that were foreseeable to the defendant.") (internal citation omitted).

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 18

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See Robel*, 59 P.3d at 619.

The relationship between Plaintiff and Fitzgerald was a soured relationship. Plaintiff had complaints about how Fitzgerald, as the Manager of QCC, and the other Defendants were operating QCC. There were disagreements about Plaintiff's attempts to change how QCC was operated. This context matters in evaluating Fitzgerald's interactions with Plaintiff because it is within this context that a heated interaction occurred on March 21, 2023. Plaintiff described Fitzgerald as speaking angrily and that she left the room because the argument "was not going to go anywhere, and [she] was getting pretty unsettled." (Dkt. No. 40 at 57.) There was yelling, accusations and some arm waving from across a table during this meeting, but in the context of their disagreement about how the QCC was operating, such conduct at most can be described as involving insults, indignities, annoyances, or petty oppressions.

The same conclusion is reached regarding Plaintiff's interaction with Fitzgerald on August 4, 2024. Viewed in the light most favorable to Plaintiff, Fitzgerald was visibly angry, was in Plaintiff's face, and told Plaintiff to "Get out" after she arrived at the QCC. She then told him, "Are you trying to intimidate me," after which he walked away. But even so, at most Fitzgerald's conduct would be characterized as insulting, indignant or annoying. Reasonable jurors could not conclude Fitzgerald engaged in conduct beyond all possible bounds of decency.

Plaintiff asks the Court to find otherwise in part because she claims Fitzgerald had knowledge she suffered from PTSD and was therefore more susceptible to suffering harm based on Fitzgerald's conduct. However, the record is unclear as to what exactly Fitzgerald (or any of the Defendants) knew about Plaintiff's mental health. Mere reference to Plaintiff's PTSD at a protection order hearing involving DiMaggio, which occurred after the March 21, 2023

interaction, is insufficient for the Court to conclude that Fitzgerald had appreciable knowledge about Plaintiff's health such that he consciously disregarded Plaintiff's health when he yelled at her.

In short, the Court concludes that no reasonable juror would conclude Fitzgerald engaged in outrageous conduct towards Plaintiff.

### b. OlyCAP's Response to Plaintiff's Complaints about Fitzgerald

With respect to OlyCAP's decision not to discipline Fitzgerald, this cannot serve as the basis of an outrage claim given that a reasonable jury could not find Fitzgerald's underlying conduct to be extreme or outrageous.

### 2. Jefferson County and Brotherton

Plaintiff argues there are genuine issues of material fact regarding her outrage claim against the Jefferson County Defendants. Plaintiff identifies the April 2, 2023 meeting between herself, DiMaggio, Uchida and Brotherton during which she alleges Brotherton "warned Plaintiff that her continued advocacy—specifically her requests for a financial review—would carry consequences, including the withdrawal of his support if she did not cease." (Dkt. No. 45 at 11.) Plaintiff alleges Brotherton "further escalated" the encounter by accusing the trio of creating a toxic environment at QCC and referring to the trio as the "Spanish Inquisition," "a disparaging remark that a reasonable jury could interpret as an attempt to intimidate and silence her." (*Id.* at 12.) Plaintiff claims she interpreted Brotherton's "Spanish Inquisition" remark as a joke and a reference to a well-known Monty Python sketch.[10] (Dkt. No. 43-2 at 15–16.) However, Plaintiff claims that when she laughed at the reference and quoted it, Brotherton "did not respond with even a smile" and "looked at [her] with absolutely dead eyes and anger[.]" (*Id.* at 16.)

---

[10] https://www.youtube.com/watch?v=psMMKgvpGfg

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 20

Even assuming Brotherton[11] made the statements Plaintiff alleges, these assertions constitute precisely the type of threats and insults that cannot form the basis of an outrage claim. Brotherton's comment about withdrawing support for a commercial kitchen and community showers at QCC appears to be a threat made in the context of routine political horse trading, and a reasonable jury could not find this statement to be extreme and outrageous. Similarly, Brotherton's "Spanish Inquisition" remark and his failure to laugh at Plaintiff's Monty Python reference at most constitutes moderately insulting behavior that does not rise to the level of extreme and outrageous conduct.

Accordingly, Defendants' motions for summary judgment as to Plaintiff's claims for Intentional Infliction of Emotion of Distress are GRANTED.

## C. Negligent Infliction of Emotional Distress

"[A] defendant has a general duty to avoid the negligent infliction of emotional distress." *Bishop v. State*, 889 P.2d 959, 962 (Wash. Ct. App. 1995) (internal citation omitted). However, emotional distress is a "fact of life" and there are limitations on a defendant's liability. *Id.* Under established notions of negligence, a duty is owed to others only with respect "to those risks or hazards whose likelihood made the conduct unreasonably dangerous." *Id.* In Washington, to state a claim for negligent infliction of emotional distress, a plaintiff must prove duty, breach, proximate cause, damage, and "objective symptomatology." *Kumar v. Gate Gourmet, Inc.*, 325 P.3d 193, 205 (Wash. 2014) (internal citations omitted). "[I]n determining whether a duty is owed to the plaintiff, a court must decide not only who owes the duty, but also to whom the duty is owed, and what is the nature of the duty owed." *Keller v. City of Spokane*,

---

[11] Plaintiff also alleges that Cronmiller also referred to her and her husband as the "Spanish Inquisition." (Dkt. No. 43-2 at 15.)

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 21

44 P.3d 845, 848 (Wash. 2002).  Moreover, to maintain an action for negligent infliction of emotional distress, a plaintiff's distress must be "susceptible to medical diagnosis and prov[able] through medical evidence."  *Kumar*, 325 P.3d at 205.

1. OlyCAP, Fitzgerald, Cronmiller, and Miller

Plaintiff contends a reasonable jury could conclude OlyCAP Defendants breached a duty to exercise reasonable care in their treatment of her.  (Dkt. No. 44 at 14.)  Plaintiff argues OlyCAP Defendants owed Plaintiff a duty to act reasonably and to avoid causing foreseeable emotional harm, which they breached by "handling the assaults by Fitzgerald in a manner that foreseeably caused emotional distress, including through escalating restrictions, public or confrontational interactions, and ultimate exclusion under disputed circumstances."  (*Id.*)

But Plaintiff does not identify the nature of the duty the OlyCAP Defendants allegedly owed to Plaintiff.  Citing generally to OlyCAP's Policies and Procedures, Plaintiff vaguely asserts the OlyCAP Defendants' "own policies—prohibiting intimidation, harassment, and abusive conduct—underscore that duty and define the standard of care expected within its operations."  (Dkt. No. 44 at 14.)  But "[i]n the law of negligence, a duty of care is defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another."  *Affiliated FM Ins. Co. v. LTK Consulting Services, Inc.*, 243 P.3d 521, 526 (Wash. 2010) (citation and internal quotations omitted).  In determining whether the law imposes a duty of care, a court weighs "considerations of logic, common sense, justice, policy, and precedent."  *Id*. (citations and internal quotations omitted).  Plaintiff offers no authority supporting the existence of a legal duty the OlyCAP Defendants owed to her.  Thus, her negligent infliction of emotional distress claim fails.

Moreover, for the reasons discussed elsewhere in this order, the Court finds Plaintiff cannot maintain a cause of action for assault against Fitzgerald, nor can Plaintiff maintain an outrage claim predicated on Fitzgerald's conduct or Defendants' decision not to discipline Fitzgerald. This means, even if OlyCAP Defendants owed Plaintiff a duty of reasonable care, Plaintiff cannot establish that they breached that duty.

2.   Jefferson County and Brotherton

Jefferson County Defendants argue they did not owe Plaintiff a duty. (Dkt. No. 42 at 11–12.) Defendants cite the public duty doctrine, which provides that when the defendant in a negligence action is a governmental entity, "a plaintiff must show the duty breached was owed to him or her in particular and was not the breach of a duty owed to the public in general." *Fabre v. Town of Ruston*, 321 P.3d 1208, 1213 (Wash. Ct. App. 2014). Defendants contend that none of the exceptions to the public duty doctrine apply and argue Plaintiff has not established Jefferson County Defendants breached a duty owed to her individually rather than to the public at large. (Dkt. No. 42 at 11.) Plaintiff contends that further discovery is needed for Plaintiff to determine whether an exception to the public duty doctrine applies. (Dkt. No. 45 at 13.) Discovery in this case closed on April 29, 2026. (Dkt. No. 33.) The Court finds no evidence that any of the exceptions to the public duty doctrine apply in this case, and further finds that Jefferson County Defendants did not breach a duty of care even if one was owed, for the reasons identified above.

Accordingly, Defendants' motions for summary judgment as to Plaintiff's claims for negligent infliction of emotional distress are GRANTED.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 23

**D. Slander**

Plaintiff alleges Defendants made "false and unprivileged communications" about her.[12] (Dkt. No. 1 at 10.)  "A defamation plaintiff must prove four essential elements: (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages."  *Demopolis v. Peoples Nat. Bank of Washington*, 796 P.2d 426, 428 (Wash. Ct. App. 1990).

       1.  <u>Fitzgerald</u>

Plaintiff alleges Fitzgerald made "slanderous statements" to the Jefferson County Sheriff's deputies who responded to the April and August 2024 incidents at QCC.  (Dkt. No. 1 at 8.)  Plaintiff's complaint does not specify what Fitzgerald told the Sherriff's deputies on these occasions, but Fitzgerald acknowledges he told the deputies that Plaintiff, DiMaggio, and Uchida "had falsely accused me of assault, and I did tell the officer that I believed they were engaging in implicit racism."  (Dkt. No. 41 at 5.)  Fitzgerald states he did so "'in aid of my concerns about being able to safely operate the Center without harassment, and in aid of obtaining law enforcement guidance about their 'right' to be present.'"  (*Id.*)

Plaintiff contends that during these encounters Fitzgerald accused Plaintiff of "l[ying] on the stand" during the 2023 hearing on DiMaggio's petition for a protection order.  (Dkt. No. 44 at 16.)  Plaintiff also claims Fitzgerald stated her actions were "racially motivated" and racially charged."  (*Id.*)

With respect to the statements Fitzgerald made to Sheriff's deputies, Fitzgerald claims any slander claim against him is barred by various privileges.  (Dkt. No. 39 at 19.)  Relevant here, Washington law provides that a person who communicates a complaint or information to

---

[12] Plaintiff asserts a claim for slander against all Defendants in this case.  (*See* Dkt. No. 1 at 10.) However, in Plaintiff's responses, she only identifies allegedly slanderous statements made by Fitzgerald and Brotherton.  (*See* Dkt. Nos. 44 at 16–17; 45 at 13–18.)

any branch or agency of federal, state, or local government "is immune from civil liability for claims based upon the communication to the agency or organization regarding any matter reasonably of concern to that agency or organization." Wash. Rev. Code § 4.24.510. "The purpose of the statute is to protect citizens who come forward with information that will help make law enforcement and government more efficient and more effective." *Campanelli v. Peacehealth Southwest Medical Center*, 565 P.3d 933, 946 (Wash. Ct. App. 2025) (internal quotations omitted). Communications concerning "a matter of reasonable concern to the police," namely the reporting of a possible crime, fall within the scope of the statute, which "tolerates some degree of overinclusiveness" because "any person who communicates information reasonably of concern to the government must be immune to suit based on the communication." *Id.* Here, Fitzgerald's communications to Jefferson County Sherriff's deputies were made for the purpose of reporting a possible crime, namely trespassing, and Washington law provides him civil immunity from Plaintiff's slander claim arising from Fitzgerald's interaction with the police.

With respect to Fitzgerald's statements at the 2023 hearing on DiMaggio's petition for a protective order, Fitzgerald testified that he believed there was an element of racism in the efforts of Plaintiff and DiMaggio to paint him as a "big, scary, black man" given that he had "not actually done anything physically intimidating or assaultive" towards either of them. (Dkt. No. 41 at 2.) Even if these statements could be considered slanderous, "[a]llegedly libelous statements, spoken or written by a party or counsel in the course of a judicial proceeding, are absolutely privileged if they are pertinent or material to the redress or relief sought, whether or not the statements are legally sufficient to obtain that relief." *McNeal v. Allen*, 621 P.2d 1285, 1286 (Wash. 1980). Here, Fitzgerald's testimony concerning his perception of his interactions

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 25

with Plaintiff and DiMaggio was pertinent to the relief sought by DiMaggio, namely the entry of a protection order against Fitzgerald because of his behavior during those interactions. Accordingly, Fitzgerald's testimony is protected by an absolute privilege. *Demopolis*, 796 P.2d at 429 ("An absolute privilege protects the maker of an otherwise defamatory communication from all liability for libel or slander.").

Fitzgerald also argues that any statements regarding possible racial prejudice on the part of Plaintiff or DiMaggio were statements of opinion rather than fact, and were therefore not defamatory per se. (Dkt. No. 39 at 20.) "The alleged defamatory statement must be a statement of fact, not a statement of opinion." *Life Designs Ranch, Inc. v. Sommer*, 364 P.3d 129, 135 (Wash. Ct. App. 2015). "As the line between fact and opinion is sometimes blurry, [courts in Washington] consider the following factors to determine whether a statement is actionable: (1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts." *Id.* (internal citations and quotation marks omitted). Fitzgerald contends the medium and context of his statements, which were made to the police and during a judicial proceeding, indicates that his statements were intended as opinions. (Dkt. No. 39 at 20.) In addition to establishing that Plaintiff's slander claims against Fitzgerald are barred by existing privileges, Fitzgerald also presents a colorable argument that his perceptions concerning the behavior of Plaintiff and DiMaggio were statements of opinion rather than fact.

2. Brotherton

Plaintiff contends Brotherton's comments regarding the "toxic" environment created by her at QCC and his references to her as part of the Spanish Inquisition constitute slander. (Dkt. No. 45 at 13–18.) Brotherton's comments, which Plaintiff found insulting, are expressions of

opinion that cannot form the basis of a slander claim. *Haueter v. Cowles Publ'g Co.,* 811 P.2d 231, 239 (Wash. Ct. App. 1991) (noting that "rhetorical hyperbole" is constitutionally protected and not actionable as defamation); *Robel*, 59 P.3d at 622 ("vulgarisms, along with the word 'idiot,' were plainly abusive words not intended to be taken literally as statements of fact").

Accordingly, Defendants' motions for summary judgment as to Plaintiff's slander claims are GRANTED.[13]

### E. Violation of the Americans with Disabilities Act

Plaintiff alleges OlyCAP and QCC violated Title III of the ADA. (Dkt. No. 1 at 10–12.) "The ADA is structured as separate titles governing different conduct: Title I, 42 U.S.C. §§ 12111–12117, covers discrimination in employment; Title II, 42 U.S.C. §§ 12131–12165, covers discrimination in public services; and Title III, 42 U.S.C. §§ 12181–12189, covers discrimination in public accommodations and services operated by private entities." *Sharkey v. O'Neal*, 778 F.3d 767, 770 (9th Cir. 2015).

"An individual alleging discrimination under Title III must show that: (1) he is disabled as that term is defined by the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; (3) the defendant employed a discriminatory policy or practice; and (4) the defendant discriminated against the plaintiff based upon the plaintiff's disability by (a) failing to make a requested reasonable modification that was (b) necessary to accommodate the plaintiff's disability." *Fortyune v. American Mult-Cinema, Inc.*, 364 F. 3d 1075, 1082 (9th Cir. 2004). "If the plaintiff makes such a showing, the defendant must make the

---

[13] Having concluded Brotherton's expressions of opinion are not actionable, the Court declines to analyze Brotherton's defense of legislative immunity.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 27

requested modification unless it proves that doing so would alter the fundamental nature of its business." *Id.*

### 1. OlyCAP

OlyCAP does not appear to dispute that Plaintiff meets the first two elements for establishing a Title III ADA claim. Instead, they argue they (1) never employed a discriminatory policy or practice; and (2) they never discriminated against Plaintiff based on her disability. (Dkt. No. 39 at 20–22.)

#### a. Whether Defendant Employed a Discriminatory Policy or Practice

OlyCAP argues there is no evidence that OlyCAP has a discriminatory policy or practice under Title III that was preventing Plaintiff's access to QCC. (*Id.* at 21.) OlyCAP argues its actions in trespassing Plaintiff from the community center was a one-time act based on Plaintiff's behavior, which was interfering with Fitzgerald's ability to perform his duties, and not part of a policy or practice of excluding disabled individuals. (*Id.*)

Plaintiff argues OlyCAP "engaged in a sustained course of conduct aimed at excluding Plaintiff Oliver from the QCC," which undermines any claim that she failed to make a reasonable request for accommodation. (Dkt. No. 44 at 18.) Plaintiff cites Defendant Cronmiller's decision to prohibit her from volunteering at QCC for nearly a year. (*Id.*) Plaintiff claims that during periods when she was present, OlyCAP "contacted law enforcement, resulting in police intervention and, ultimately, Oliver being formally trespassed from [QCC]." (*Id.* at 18–19.) Plaintiff claims this pattern of exclusionary conduct "evidences not only Defendants' unwillingness to engage in any meaningful accommodation process, but also supports a reasonable inference that Oliver was treated adversely because of her disability." (*Id.*)

Plaintiff has failed to identify any discriminatory policy or practice by which OlyCAP excludes people with mental health disabilities from QCC.  Nor does Plaintiff allege that she ever requested a specific accommodation for her disability.  Rather, Plaintiff appears to allege OlyCAP failed in its obligations under the ADA by not taking stronger action against Fitzgerald in response to her complaints.  First, for the reasons identified above, Fitzgerald's behavior was not as extreme as Plaintiff suggests.  *See supra* Section III.B.  Second, OlyCAP's response to Plaintiff's behavior and complaints is not evidence of a discriminatory "policy" or "practice" of excluding individuals with mental health disabilities.

b.    Whether Defendant Discriminated Against Plaintiff Based Upon the
Plaintiff's Disability

OlyCAP further argues it had no knowledge of Plaintiff's disability until June 2024, when she mentioned her PTSD in an email to Rodney Miller.  (Dkt. No. 39 at 21.)  OlyCAP contends Plaintiff never requested any accommodation to allow her to use the community center, and that Plaintiff's only request in her email to Miller was for OlyCAP to investigate Fitzgerald further.  (*Id.*)  Plaintiff argues Defendants knew of her disability as early as March 2023, when her PTSD was discussed at the hearing for the protection order Plaintiff's husband sought against Fitzgerald.  (Dkt. No. 44 at 17.)  Plaintiff also claims Fitzgerald mentioned her PTSD to police when he called to have Plaintiff and DiMaggio removed from the community center.  (*Id.*)

When Defendants knew of the nature and extent of Plaintiff's PTSD is a question of fact.  However, there is not a genuine dispute of material fact concerning whether Defendants discriminated against Plaintiff based on disability.  First, Plaintiff did not make any request for a reasonable modification based on her disability.  To the extent Plaintiff sought any action from Defendants, it was for them to take harsher measures against Fitzgerald, an individual whom

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 29

Plaintiff found physically intimidating.  Plaintiff might argue that Defendants treated her differently, and imposed restrictions, based upon behavior that was caused by Plaintiff's mental health condition.  *See Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139–1140 (9th Cir. 2001) ("For purposes of the ADA . . . conduct resulting from a disability [generally] is considered to be part of the disability.").  However, Plaintiff does not allege the conduct that brought her into conflict with Defendants—namely the unauthorized formation of the interim advisory board, her conflicts with Fitzgerald over management of QCC, and her attempts to visit the community center under circumstances that brought her into conflict with QCC's management—were caused by her mental health condition.

### 2.   Jefferson County

Jefferson County does not dispute that Plaintiff is "disabled" for purposes of the ADA, but does argue that: (1) they had no knowledge of Plaintiff's disability; and (2) Plaintiff cannot maintain a Title III claim against Jefferson County.  (Dkt. No. 42 at 17–21.)  As discussed above, precisely when any Defendants in this case became aware of the nature and extent of Plaintiff's disability is a question of fact.  Notwithstanding, Plaintiff agrees her Title III ADA claim is inapplicable to Jefferson County.  (Dkt. No. 45 at 20.)  Instead, Plaintiff argues she should be allowed to pursue a Title II claim because Plaintiff's claim "arises from the same nucleus of operative facts and provides Defendants with fair notice of the alleged ADA violations."  (*Id.*)  Plaintiff requests leave to "conform the pleadings to the evidence" rather than have her claim dismissed on a "technical" distinction.  (*Id.*)

Plaintiff's argument is unpersuasive.  To the extent Plaintiff's response seeks leave to amend her complaint, any such leave is DENIED.  Plaintiff filed her complaint nearly two years ago.  The deadline for amended pleadings passed on January 16, 2025, and Plaintiff never sought

to amend her complaint to assert a Title II claim against Jefferson County.  The Court concludes amendment at this stage would be prejudicial to Defendants.

Accordingly, Defendants' motions for summary judgment as to Plaintiff's ADA claims are GRANTED.

### F. Discrimination Based Upon Origin, Race and Sex

Defendants argue Plaintiff admitted she was unaware of any facts to support her WLAD claim.  (Dkt. Nos. 39 at 22; 42 at 17.)  In her deposition, Plaintiff could not identify any facts indicating she was discriminated against based her based on her race or her sex.  (Dkt. No. 40 at 67.)  Plaintiff's replies offer no facts to the contrary.

Accordingly, Defendants' motions for summary judgment as to Plaintiff's claims for discrimination based on origin, race, and sex are GRANTED.

### G. Breach of Contract

In her complaint, Plaintiff alleges she was a third-party beneficiary of the contract between OlyCAP and Jefferson County to run QCC.  (Dkt. No. 1 at 12–13.)  Plaintiff contends she was damaged when OlyCAP breached the contract.  (*Id.*)  "A third-party beneficiary contract exists when the contracting parties intend to create one." *Donald B. Murphy Contractors v. King County*, 49 P.3d 912, 914 (Wash. Ct. App. 2002).  "The test of intent is an objective one: whether performance under the contract would necessarily and directly benefit the third party." *Id.* "Merely incidental, indirect or inconsequential benefits to a third party are insufficient to demonstrate an intent to create a third-party beneficiary contract." *Id.*

OlyCAP argues there is no evidence Jefferson County and OlyCAP intended to benefit a third party.  (Dkt. No. 39 at 22.)  OlyCAP contends the purpose of the agreement was for OlyCAP to manage QCC.  (*Id.*)  OlyCAP argues Plaintiff is not situated differently from any

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 31

other resident of Jefferson County, and the parties to the agreement did not intend to specifically benefit her.  (*Id.*)  OlyCAP further argues that even if Plaintiff is a third-party beneficiary to the agreement between Jefferson County and OlyCAP, Plaintiff cannot demonstrate that OlyCAP breached the agreement.  (*Id.* at 22–23.)

Plaintiff argues the language of the contract establishes that it was intended to directly benefit community members such as Plaintiff.  (Dkt. No. 44 at 20.)  Plaintiff points to Section 1 of the contract which requires OlyCAP to provide daily operation of all three community centers, which includes scheduling of events, program planning and activities, building security, and scheduling use of the centers by community groups and organizations.  (Dkt. No. 40 at 100.)  Plaintiff also cites language in the agreement that requires OlyCAP to appoint local advisory boards.  (*Id.* at. 101.)  Plaintiff argues these obligations are expressly directed toward "ensuring that the community, and those who use and participate in the community center, receive meaningful services, programming, and representation."  (Dkt. No. 44 at 20.)  Plaintiff argues OlyCAP failed to fulfill contractual obligations by not operating the community center properly and not appointing an advisory board for QCC in a timely manner.  (*Id.* at 21.)

Here, there is no evidence the parties intended Plaintiff to be a third-party beneficiary of the agreement.  The broader purpose of the agreement between Jefferson County and OlyCAP is "to promote community-based services for the benefit of Jefferson County residents."  (Dkt. No. 40 at 100.)  However, the language of the agreement, which spells out the services to be provided by OlyCAP and the responsibilities of Jefferson County, makes clear that the intent of the parties was to enter into a contract for management of the community center.  (*Id.* at 100–104); *Postlewait Construction, Inc. v. Great American Ins. Companies*, 720 P.2d 805, 807 (Wash. 1986) ("The contracting parties' intent is determined by construing the terms of the contract as a

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 32

whole, in light of the circumstances under which it is made.").  While the ultimate goal of the agreement is to provide community services to residents of Jefferson County, performance of the contract necessarily and directly benefits OlyCAP and Jefferson County, and only indirectly benefits residents of Jefferson County.  *Id.* at 806 (quoting *Burke & Thomas, Inc. v. International Org. of Masters*, 600 P.2d 1282, 1285 (Wash. 1979) ("The creation of a third-party beneficiary contract requires that the parties intend that the promisor assume a direct obligation to the intended beneficiary at the time they enter into the contract.")).

Accordingly, Defendants' motion for summary judgment as to Plaintiff's breach of contract claim is GRANTED.

**H.  Assault**

A party is liable for assault where "he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and . . . the other is thereby put in such imminent apprehension."  *Brower v. Ackerley*, 943 P.2d 1141, 1145 (Wash. Ct. App. 1997) (cleaned up).  Washington courts have relied on the following definition of assault:

> An assault is an attempt, with unlawful force, to inflict bodily injuries on another, accompanied with the apparent present ability to give effect to the attempt if not prevented.  Such would be the raising of the hand in anger, with an apparent purpose to strike, and sufficiently near to enable the purpose to be carried into effect; the pointing of a loaded pistol at one who is in its range; the pointing of a pistol not loaded at one who is not aware of that fact and making an apparent attempt to shoot; shaking a whip or the fist in a man's face in anger; riding or running after him in threatening and hostile manner with a club or other weapon; and the like.

*Id.* at 1114 (quoting *Howell v. Winters*, 108 P. 1077, 1078 (Wash. 1910)).  Plaintiff argues Fitzgerald assaulted her during their interactions on March 21, 2023 and August 4, 2024.  (Dkt. No. 44 at 21–24.)

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 33

Regarding the March 21, 2023 incident, Plaintiff described that Fitzgerald "was speaking very angrily," that he was leaning forward, and that he "was gesticulating towards" Plaintiff. (Dkt. No. 40 at 56.)  When asked to clarify what she meant, Plaintiff stated Fitzgerald "was waving his arms towards – one of his arms was going towards me" but he was not within range to make contact with her because he was on the other side of a table.  (*Id*. at 55–56.)  Plaintiff also testified the reason she left the room was because the interaction with Fitzgerald "was not going to go anywhere, and [she] was getting pretty unsettled."  (*Id*. at 57.)

Even construing these facts in Plaintiff's favor, reasonable jurors would not conclude that Fitzgerald intended to cause harmful or offensive contact with Plaintiff, that he intended to place Plaintiff in imminent apprehension of such contact, or that he displayed an apparent purpose to strike Plaintiff.

The Court reaches the same conclusion regarding Plaintiff's August 4, 2024 interaction with Fitzgerald.  Plaintiff described Fitzgerald as being angry while telling her to "Get out" and also stated he "got in [her] face."  (Dkt. No. 46 at 29-30.)  But as soon as Plaintiff stated, "Are you trying to physically intimidate me," Fitzgerald walked away from her.  (*Id*. at 30.)  Reasonable jurors could not conclude Fitzgerald assaulted Plaintiff on August 4, 2024.

Accordingly, Fitzgerald's motion for summary judgment as to Plaintiff's assault claim is GRANTED.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 34

## IV.   ORDER

For the reasons discussed herein, Defendants' motions for summary judgment (Dkt. Nos. 39, 42) are GRANTED.  All claims are DISMISSED with prejudice.  The Clerks is directed to enter judgment in favor of Defendants and to close the case.

Dated this 14th day of July, 2026.

David G. Estudillo
United States District Judge

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 39, 42) - 35